# ARTHUR N. KANE v. SIDNEY F. SHERMAN.

(130 N. W. 222.)

**Brokers — Contract — Pleading.**

1. Before a broker can recover for services as such, he must plead and sustain a contract of employment, express or implied.

Note.—What constitutes employment of real estate broker which will entitle him to commissions otherwise earned, see note in 27 L.R.A. (N.S.) 786.

Brokers — Contract — Evidence.

>   2. Evidence in this case does not show such a contract, and the trial court properly directed the jury to find for the defendant.

Opinion filed February 11, 1911.

Appeal from the District Court, Cass county; *Pollock, J.*

Action by Arthur N. Kane against Sidney F. Sherman. Judgment for defendant, and plaintiff appeals.

Affirmed.

*Edward H. Wright* and *Turner & Murphy,* for appellant.

*Robert M. Pollock* and *Pollock & Pollock,* for respondent.

Burke, J. During the times hereinafter mentioned, plaintiff was a real-estate dealer and broker living at St. Paul, Minnesota, and the defendant was engaged in a similar business at Tower City, North Dakota.

For convenience we will designate them K. and S., respectively. Their transactions began November 19, 1906, when S. wrote a letter to K., probably in answer to an advertisement that K. was then running in one of the Twin City papers, offering to trade city property for North Dakota farm lands. This letter probably also contained Exhibit B, hereinafter referred to. This letter reads as follows: "Have you any St. Paul or Minneapolis property to exchange for improved farm lands in North Dakota? I have several hundred acres of good land in this vicinity, accumulated during several years' land business, and am now contemplating moving to Minneapolis in a different line of business. I could handle such property from there better than my farm lands, and if a good trade could be made, would consider it. Something worth $50,000 to $75,000 would be as large a deal as I would care to handle. Would expect to put in the lands at their actual value. If you have anything in this line, I will be pleased to hear from you."

November 20, 1906, K. replied: "Replying to your favor of the 19th inst., will say that I have a client here in St. Paul who owns a good flat property in Minneapolis near the University, with a rental of $7,500 a year, that he will exchange for good cheap lands either im-

proved or wild, if a reasonable exchange can be made. If you will send me a list of your lands, giving prices, encumbrances, etc., I will try to submit a proposition to you that will be satisfactory."

November 26, 1906, S. replied, inclosing a list of his lands, and saying: "If the property which you mention is good, and the owner of the same will consider a trade, I will be glad to have you give me a full description of the property." K. did not reply, and on December 24, 1906, S. wrote to him again, saying: "On November 21st I sent you a list of the lands which I wished to trade for city property. Please advise if same has been received, and if so, what the prospects are for doing business with you."

December 26, 1906, K. replied: ". . . I have been offered a large flat property in Minneapolis, as per inclosed statement, . . . if you care to consider a deal, will be pleased to take it up with the other party."

On January 3, 1907, S. replied, inquiring about the flats, and adding, "When you have taken the matter up with your parties let me know, etc." Then followed several letters consisting of inquiries and answers as to the two properties and the terms upon which a trade might be made, and about January 26, 1907, S. went to St. Paul to close a trade. It was then discovered that K.'s party did not own the property in Minneapolis, and S. returned to North Dakota. The following day K. wrote to him: "I am sorry there was a snag in the Minneapolis property. . . . Do you intend to go ahead and make a trade if you can find something satisfactory? If so I will be glad to see what I can find, and the next time you are in the cities you can look them over. . . . I looked around St. Paul yesterday and found a business property, the Court Block, and got into touch with the real owner. . . ."

January 28, 1907, S. answered: "Am open for any reasonable proposition. . . . Give me a full description of the Court Block." This was followed by a lengthy correspondence concerning said property and the terms of trade. This correspondence, consisting of some thirty letters, is too long to reproduce here, especially as all of the letters were dated after November, 1906, and could not contain a contract made in that month; their only use being to show whether the parties themselves understood that a contract had in fact been made in November. We

have carefully examined this correspondence, and find that it contains no mention of such a contract, excepting in the extracts that we have set forth in this opinion.

April 17, 1907, S. received from K. this telegram: "Come down to-night. Party returns with you. Deal depends on lands." S. replied by wire: "As deal depends on lands, no need for me to go down now. Send your party out, I will show lands; if satisfactory, will return with him." The owner of the Court Block sent his brother to inspect the lands, which led to S. going to St. Paul about May 6, 1907, where he met K. and the owner of the Court Block, a Mr. Davidson, and inspected the Court Block, but made no agreement relative to a trade. S. went to his hotel that evening and wrote two letters, one to K. and one to Mr. Davidson. To K. he wrote: "Since leaving your office this afternoon, I have come to the conclusion that it is best to drop the Court Block trade entirely." To Mr. Davidson he wrote, saying that he had written to K., and adding: "He represented to me that you were ready to close the matter practically upon the option given you, and I was induced to come to St. Paul on such representation. While he may have acted in all honesty in his belief in the statement, it has nevertheless put me to needless inconvenience. Should you desire to take the matter up with me direct, I shall be glad to have you do so." Mr. Davidson then took the matter up direct with S., and six days later finally reached an agreement to trade, though on materially different terms than had been mentioned in the correspondence between S. and K., S. having added 160 acres to the lands traded, and paying more cash. Davidson in return allowed to S. two thirds of the 1907 crops upon the lands.

At the trial K. was asked his understanding of his contract with S., and testified as follows:

Q. And you were employed by him by virtue of this letter which he wrote you November 19?

Ans. Yes.

Q. And you want it understood that you were working for Mr. Sherman when you wrote the letter of November 20, 1906?

Ans. Yes.

Q. This is the contract, is it?

Ans. Yes, I considered that the employment continued from that time up to the time the Court Block was purchased by Mr. Sherman.

S. was called for cross-examination under the statute, and admitted the writing of the letters introduced in evidence; admitted having prob.ably inclosed Exhibit B in one of his letters to K., and explained that Exhibit B was a copy of a circular letter that he had prepared some time previous, and had been inclosing in his letters to eastern corre·spondents.

As this circular probably was inclosed in a letter written in Novemîber, we will set it out in full.

### Exhibit B.

Tower City, North Dakota.

Dear Sir:—

I want you to find me a buyer for a 440-acre farm in eastern Barnes ·county, North Dakota. This farm has 400 acres under cultivation . . . is within 1 mile of a good town on the main line of the N. P. Railway. . . . The price is $45 per acre; and $6,000 cash will handle it, balance on reasonable terms. . . . If you know of any-·one looking for a good farm home, don't hesitate sending him out to me on this proposition. . . . This quotation is subject to prior sale ¯without notice. . . . I will pay a cash commission of $500, the railroad fare, and expenses of agent and buyer, if you send or bring me a purchaser who buys the farm of me on those terms, or, if neces-.sary, I can probably arrange to protect you $1. per acre additional to ¯the price quoted. Get me a buyer, and you will not regret it, nor will ¯the buyer regret that he has bought the farm. It is a bargain.

I have other good propositions, and if you have farm buyers, for actual settlement or for investment, let me know what you want, and I will match same.

Yours for business,

S. F. Sherman.

¯First Nat'l Bank Bldg.

Kane brought this suit for $2,146.50, being $1 an acre for the land that Sherman had traded to Davidson, and in his complaint alleges that

in November, 1906, S. employed him as a broker to exchange said lands. for city property in St. Paul or Minneapolis, and that said S. had' agreed to pay him a reasonable commission for his services in effecting: the exchange. A trial was had to a jury, the correspondence mentioned above was admitted without objection, and oral testimony taken. There· was no dispute as to the facts, as the defendant offered no testimony. At the close of the plaintiff's testimony, the court directed the jury to· find for the defendant. This appeal is from the judgment resulting.

We think the trial judge was correct. It is elementary that a broker· has no superior rights, as such, to collect for his services, but must al-- lege and prove a contract, express or implied. 19 Cyc. Law & Proc. p.. 190.

There was no express contract shown; if there was any contract it: must be implied from the letters of Sherman written in November, 1906, in which month Kane claims the contract was made. Did S. so· conduct himself that the law will step in and say that he has agreed by implication to pay K. a commission? To answer this question, we must: look at the circumstances surrounding the parties at that time. The· first letter of S. was probably suggested by the advertisement that K. was running in the Twin City papers, to the effect that he had city· property to trade for North Dakota farm lands. Kane's first letter· stated that he (K.) *has a client* who has a flat to trade. Those parties. had never seen each other or spoken to each other in November, 1906,. and the letters above cannot possibly support any contract, even by im- plication.

December 24, 1906, S. wrote to K., "What are the prospects of do-- ing business *with you?*" and again, January 3, 1907, "When you have taken up the proposition with *your parties,* let me know." We have· added italics.

These statements are inconsistent with plaintiff's theory.

We cannot see that Exhibit B bears upon this case. It was a copy· of a circular, inclosed with a regular letter; it related to land not owned by S., but by a farmer client of his; it stated in positive terms the com-- mission that S. would pay for making that particular sale. It was in. fact notice to K. that S. wanted all agreements as to commissions made·· in advance of the services, and that he would pay no other. K. had no-- right to foist services worth $2,146.50 upon S. upon so slight an invi--

tation. If he considered himself employed on and after November 19, 1906, as he testifies, it was his duty to inform S. of that fact, and reach some positive agreement as to the amount of his compensation. Not having done so, S. had a right to treat him as a principal, or as an agent of some undisclosed principal. We think the correspondence shows that S. did so consider him.

As plaintiff has failed to substantiate the material allegation of his complaint, the trial court properly directed the jury to find against him.

Judgment affirmed.

All concur, except MORGAN, Ch. J., not participating.